The Chief Judge from the District of Delaware is obviously very familiar with a variety of cases that come under the auspices of our jurisdiction, so we're very pleased to have him join us today. Thank you very much, Judge O'Malley. Pleasure to be here. We originally had four cases for argument today, and for a variety of reasons we have now collapsed it down to two cases for argument, which is unusual for us. But the first case, which is an appeal from the Court of International Trade, is CP Kelco US, Inc. v. United States, case number 151209. Ms. Noonan, I understand you want five minutes for rebuttal? Yes, Your Honor. Okay, you may proceed. May it please the Court, Your Honors, my name is Nancy Noonan with the law firm of Aaron Fox, and together with my colleague, Matt Canna, we represent the appellant, CP Kelco US, Inc. This case involves a statutory provision which requires the U.S. International Trade Commission to consider post-petition effects in determining whether the U.S. industry that produced xanthan gum was being materially injured due to dumped imports of xanthan gum from China and Austria. You're not appealing the decision to accumulate these imports, are you? No, Your Honor. Even though they weren't accumulated for purposes of the material threat injury? That's right, Your Honor. In fact, our position is the Commission got it right for purposes of material injury. They did examine the data on accumulated basis, and our position is that if the post-petition effects were examined properly, in fact, they would continue to examine on accumulated basis. We think that would have resulted in an affirmative injury defining for both Austria and China, which ultimately would have resulted in anti-dumping orders imposed on both countries. Is it your position that the post-petition effects for Austria would be different than they would be for China, or you're solely looking at this on accumulated effect? We are looking at this on accumulated basis for the purposes of material injury. You are right, Your Honor, that the post-petition effects can be looked at for just threat of injury and also material injury, but our position is that the Commission got it right to accumulate for material injury, and if post-petition effects were looked at properly, material injury would have been found on accumulated basis. And just to make sure we've closed the loop here, you're not appealing the determination with respect to threat of injury as it relates to Austria? That's correct, Your Honor. Okay. Is it a substantial evidence review whether the petition had effects on the post-petition behavior? We think it's both in this case. We think as a matter of law, the Commission did not comply with the statute to consider the post-petition effects properly. Because it just didn't say enough. That's right. It did not analyze it enough. It didn't address all the information adequately that we had provided in support of post-petition effects. And then as a matter of evidence as well, that we think the evidence does show post-petition effects, and then that would have triggered the second part of the statutory provision which would have allowed the Commission to reduce the weight, if it so chose, for the post-petition effects. Can I ask you a question about the evidence as it relates to post-petition effects? Much of that has been designated as confidential in the briefing. So how do we talk about that? Well, I think we can talk about some trends, and I think I can, if necessary, refer you back to portions of the brief if that's acceptable to the Court.  We'll see if it works. Okay. Okay. Fair enough. Before we move on to that, can we come back to consider and the statutory requirement that they consider your evidence? What is the minimum sort of degree of explanation you contend would be necessary? Why isn't the couple of sentences in the footnote enough here? Well, in this case, Your Honor, in the footnote, the Commission said, although there is some evidence showing purchasers approached domestic producers with sales inquiries after the petition was filed, the record shows no apparent changes in subject to import volume and pricing behavior. And some evidence, there's no citations to it. What exactly were they considering to be some evidence? It looks to us like maybe that was a couple of statements by the domestic producers, but we think there's a lot of other evidence on the record from purchasers, from importers themselves, talking about the changes, that the petition was filed, there was now a short supply. They couldn't get everything that they wanted to get. They shifted purchases to the U.S. producers because of changes in sales terms. The U.S. producers are saying, hey, yeah, we definitely think there was a post-petition effect because we were being approached to sell. And unlike this footnote, which just said it was being approached with sales inquiries, we think the evidence shows that sales were made, and they were being made as a result of this petition. But the statute doesn't say shall explain in detail and with citation to the record. It says shall consider. On what basis could we say that the Commission failed to consider your evidence? Well, Your Honor, I think, you know, looking at the plain meaning of the word consider, which is to, you know, carefully review something, I think that there is enough here that wasn't, that it's not clear that they considered. You're right, maybe on remand they would walk through more of the data and we'd have to, you know, let it rest. But we think at this point, with all the information, all the evidence on the record, this is not, this does not meet the standard of considering. Well, even if they had some obligation to cite specific things in the record, there is a big difference between inquiries and actual volume and price effect, is there not? Yes, there is. And we think that, you know, certainly everyone agrees that the domestic producers were able to sell a lot more in 2012 than they had in 2011. Where we think the post-petition effect would really impact the material injury decision is on the market share analysis. It's clear that ultimately this case was about market share. The Commission agrees that volume was increasing on an absolute basis. They agree that there was significant underselling, but what the Commission found was because market share remained stable, then the U.S. industry could not have been being currently materially injured from imports. And our position is market share only was remaining stable in 2012 because of shifts from purchasers that normally would have purchased subject imports changing to purchase domestic. And if adjustments were made in the data for that, we would see a continuing decline in the U.S. industry. So again, the most important pieces of evidence we think that shows that there were post-petition effects is that a large purchase of xanthan gum from a domestic producer that the purchaser acknowledges in their questionnaire response they were initially going to purchase from the Chinese supplier. Instead, they shifted to the domestic producer and that large quantity is quite a huge swing in the market share. Am I remembering right that there is no testimony from that purchaser that the material was unavailable from China or was available from China, but there just that is no particular evidence as to the reason for that shift of one purchase? I think the purchaser said that they couldn't get it from China, that they were told that it was not available. And availability could mean that the Chinese sellers didn't have the stock, which would be, roughly speaking, innocent, or it could mean that the Chinese sellers were withholding it so as to help its case in the investigation. That's right, Your Honor. And we just don't know? We don't know, but we do know that the Statement of Administrative Action allows the Commission to apply a presumption that if there has been a change in volume, that that change is related to the pendency of the investigation and if the Commission can then decide to reduce the weight. It is a rebuttable presumption, but we read the Statement of Administrative Action as So you see a change that has occurred after the petition was filed with no other information other than they shifted from subject imports to domestic. We can presume that that shift was due to the pendency of the petition. Is there anything that would tell us, in the abstract, whether the percentage shift that really, that's pretty small? Well, I mean, in terms of the one purchaser, we can see when we shift that over into, let's say it did get purchased from the subject producers, we would see a several percentage point change in the market share. Right, and is that kind of change, that several percentage point change, the kind of thing that in ITC practice in general is often viewed as significant or is often viewed as not significant? What I'm trying to figure out is, it seems to me, the word considered probably needs to be applied based on how many questions are raised by the evidence and if this small percentage shift is the kind of thing that in general doesn't raise very many questions, then it might be easier to conclude that the Commission is saying, we just don't see any effect of the petition on the post-petition change that would be material. I believe the Commission does typically find these kind of percentage shifts in market share to be significant, coupled with increasing volumes, coupled with significant underselling. But it's true that you essentially are dealing with a double discretionary conclusion here. I mean, the Commission is supposed to consider it, there's nothing that defines what the level of consideration must be, and then once they consider it, they have the discretion to discount it or not, right? That's right, Your Honor. But again, their discretion is not unfettered. I mean, they're always bound by the substantial evidence standard, whether a reasonable person would come to the conclusion based on these post-petition effects, if they agree that there are post-petition effects, whether that did materially impact whether there was injury or not. Kate, you're in for your rebuttal. Do you want to save the rest of your time? Yes, Your Honor. Thank you. Okay, Mr. Goldfein. I think we saw you yesterday, did we not? Yes, Your Honor. Good to see you again. Okay. Not always under these circumstances, I hope. Okay. You want 11 minutes, and you're going to save 4 minutes for Mr. Wade? Yes. Okay. All right, proceed. Good morning. May it please the Court. I'm David Goldfein, appearing on behalf of the U.S. International Trade Commission. I'd like to address several points that were raised by appellants here. First, with respect to the issue of consideration, as Judge Stark's question pointed out, the statute says that we're required to consider whether there's been any change in the data, and that's exactly what we did here. The footnote cites to the appellant's brief, where they laid out all of the arguments that they're making exactly here. In fact, the same chart that's in their brief to this Court about the market share shift is in the post-hearing brief that we cited in the opinion, and that was addressed by Judge Goldberg here. So, it's plain from reading the footnote, we did consider it. As far as another issue I'd like to address, the statute says whether there's been any change in the volume, price, or impact data. That's what we do in these cases. We look for changes in the data. We did that in Nucor. Well, would you agree that impact data would include market share? Well, the statute says volume, price, and impact, and volume and price are obviously part of impact. And in these cases, in Nucor and the cases we cite in our brief, JMC and Nitrogen Solutions, we look at the volume trends, what's going on with the volumes. And here, the volumes were the same before and after the petition was filed. They haven't disputed that at all. Well, your friend on the other side argues that everybody concedes there was a big market share differential. Right. Well, there's three big problems that are counterfactual, I would say. One is that we, the first one would be we don't, it's based on a presumption that the purchaser here switched because of the petition. When, as we've explained in our brief, the record evidence here plainly contradicts that shows the purchaser identified a supply shortage. There was nothing about the petition, so that's built on that presumption. Two, it says that the counterfactual they've done, we don't do counterfactuals in post-petition. It's based on what were the trends before and after the petition was filed. We can't call subject imports domestic sales. Subject imports are subject imports. In this case, it's built on a faulty counterfactual analysis. It's just nowhere in the statute, the legislative history. The statute doesn't say anything about a presumption. We have discretion, as your honor pointed out. Three, they haven't even done a post-petition analysis. A post-petition analysis is what's in our brief, which is to compare the data in the first half of 2012 to the second half of 2012. The volumes did not change at all in those periods. They went up slightly. The one case they've cited here, the Gold East case, is exactly the opposite of fact. Typically, when there's post-petition effects, the subject import volumes will decline dramatically after the petition. That's the language that was used. This is the opposite of that case. They stayed flat. They even increased a little, but they basically were unchanged. Same with the pricing, but the underselling was exactly the same before and after the petition was filed. Their annual comparison is not... There were some price increases. I mean, there were more price increases after the petition than price decreases after the petition, right? The underselling margins was basically the same. It was basically the same before and after the petition was filed. It was the same rate. You're talking about the price increases, the rate of increases, the decreases, as we laid out in our brief. Depending on what you're looking at, first half 2010, the beginning of the period up to the month that the petition was filed in June of 2012, and you compare that to second half 2012, it's basically the same data. It's almost identical. I think there's just one difference. What happened was, when you look at it in terms of comparing the first and second half of 2012, there might be more price decreases, but that's the opposite of what you'd expect in a post-petition case. Okay. Well, what about the fact that the government did only deal with this in a footnote? I mean, why would Congress bother to pass a statute that says it must be considered if they could essentially give it what looks like the back of their hand? Well, as Judge Goldberg indicated in his opinion, you know, the commission indicated this was a very straightforward case as far as we saw it. The volume and pricing behavior didn't change, so you don't need an elaborate explanation for that. Two, in new court, this issue was raised and rejected by the court of international trade, and then this court affirmed that decision, which, you know, they argued that the commission has to cite every single piece of detracting evidence, which isn't detracting evidence at all because, as I explained, the main purchaser that they're relying on here didn't identify the petition as the reason for the change. But even if you were to view it as detracting evidence, we cited in the footnote. We considered the evidence. We cited their brief. That laid out all the arguments they're making now, the data they're saying it was presumed of, and under the law of this circuit, and, you know, we're presumed to have considered all of the evidence in the record. The fact that we don't cite every little piece of evidence doesn't mean we didn't consider it. Yeah, but don't you see a difference between every little piece of evidence and pieces of evidence, period? I mean, you cite their brief, but wouldn't it have been more appropriate to have a little bit more of a fulsome analysis to say, okay, Congress tells us we're supposed to consider post-petition effects. We're looking at these post-petition effects, and this is what our view of them is, as opposed to simply saying in a footnote, we cite to their brief and say it's not enough. Well, I have two responses to that, Your Honor. One would be that we didn't just cite to their brief. We cited to, we said there was no change in the volume and pricing, you know, behavior. So we, that's what we relied on. There was no change in the data. It wasn't rocket science here. I mean, the volumes didn't increase after the petition was filed, and the underselling and pricing behavior didn't change at all. So there, you know, it was a very straightforward analysis laid out in that footnote we sent and we cited to the data. Two is in new court. This court, you know, pointed out that maybe the commission's discussion could have been more detailed, but it affirmed the commission saying on post-petition that no expansive discussion was warranted, particularly in a case like this where the trends on their face are so obvious. Can you just go over again, you probably have said it already, your very specific response to the point about the couple of percentage point shift as a result of what I guess is just one purchaser? Yes. Well, a couple of points there. One is the purchaser, that shift is based on the presumption that that purchaser switched due to the filing of the petition. All we have on the record here is their questionnaire. That's what the commission has before when it's, you know, analyzing the record here. The questionnaire doesn't identify the petition. It identifies the supply. Sure, if they wanted to say petition, they could have said petition, but they didn't. Two is, you know, it's based on that presumption. So two is that the counterfactual, the share, the market share shift, again, we don't, if you were to find it was due to the petition, which it wasn't, but if you were, the commission has the discretion to decline to give that information unless, wait, it can't redo the math. There's no statutory basis for that or anything, you know, case-driven or anything. So we look at the data that we have. The commission didn't specifically talk about that purchase shift, right? In the footnote, we talked about volume and pricing behavior. The purchase shift was... Let me just tell you what I did. They feature this one couple of percentage point shift in purchase. One might find that significant or not according to what one thought the reason for the shift was, and one might find it significant or not according to how large in the scheme of things this couple of percentage point shift is, and one might demand an actual explanation focused specifically on the reason if that several percentage point shift was in the scheme of things significant. And the commission just didn't talk about any of this, which it seems to me is pretty much what this comes down to. So is this percentage shift the kind of thing that, in general, the commission would look at and say, we really ought to figure out why? Why it happened? Well, no. I mean, we generally in these cases, in NUCOR and the cases cited in our brief, JMC, Nigerian Solutions, you'll see the discussion. We generally look at what the volume, the statute says volume. We generally look at absolute volumes. In fact, and this court endorsed that approach in NUCOR. We're looking at volumes. Now, they can point to- Looking only at, we said in NUCOR, it doesn't matter what the percentage is. Obviously, the statute says you have to look at volume. That doesn't say what else you don't have to look at. There was no statement about you can't look at percentages, but what we generally do is we look at volumes. And part of the, there was no change in the volume data. So, you know, you can point to this market share shift, but again, it's based on at least two faulty presumptions and mainly three. One, that it was due to the petition. Two, that it was- Again, correct me if I'm wrong. The commission did not say, we look at that purchase and we find it was not proven to have been caused by the petition. It didn't say that in the opinion, but that's part of the record here. Well, it's part of the record in the sense that you say that they don't identify. They identify a shortage, but I mean, what is the economic assumption that underlies the statute that says you have to consider this? That is, that post-petition, do they assume that what? That domestic producers will be afraid to buy subject imports or is there an assumption that subject imports will pull back so as to make it look like there's less of- The point of the post-petition, the legislative, the SAA, the statute, that generally there's a decline in the volume after a petition is filed because of the restraining effect of the filing of the petition. Here, the opposite- Right, so couldn't that have been the reason for the lack of Chinese supply? Well, again, there was no- The purchaser they're pointing to didn't identify it. I mean, as far as- Well, he said, I've got less supply. I mean, why couldn't that presumption be he's got less supply because the Chinese, the subject imports, are afraid to sell to the domestic during the period of the investigation? Well, he could have said that, but they didn't. But again, and also Judge Goldberg analyzes- It didn't really affect the outcome here anyway because if you knock out 2012, which again, I want to be clear, they're not doing a post-petition analysis. Their chart is not post-petitioned. One year to the next, that's not post-petitioned. But what they're asking is knock out the 2012 data. We'll give them that. Judge Goldberg did that and he ruled under harmless error analysis, substantial evidence, that there was clearly- The story didn't change here. You knock out 2012, the trends are exactly the same. Can I just ask you about the harmless error standard? It's one thing to say they have not proved that the commission would have made a contrary finding had it not made the, now by assumption, mistake regarding petition effects. It's another thing to say that the commission could not have made a different finding. Doesn't harmless error require the latter? It's whether the court was in substantial doubt as whether the commission would have reached a different outcome. That's the standard that we cite in the cases in our brief. Judge Goldberg was not in any substantial doubt here because the record, there was no volume, price or impact on whether you, even if you knock out 2010, it's still a very strong negative determination. This was a unanimous commission determination, by the way. Can I say, you may have said this already, but have we said that the relevant statutory provision, the, what is it, 1677-7-I, when it uses the term change means change from what was or change from what would have been in the absence of the petition? Well, the statute says change. Right. To me, that could mean either of two things. The natural, in this context, causation question is a comparison to what would have happened in the absence of the petition. That's how you figure out whether this new data has been, is reliable evidence of the underlying question. Right. The statute is there to ensure that the integrity of the commission's opinion. We're looking at whether there's been a change in the data post-petition, that the filing of the petition has caused a change in the data. We've looked at volume, price and impact. We've done our analysis, but they're not challenging. The main findings there. Then we do basically a double check. We look at the post-petition for any changes in the data. There weren't any changes in the data here. I think I have not communicated my question clearly. Okay. There's the petition. There's data before, data after. So one question is, how do those two things compare? There's a different question. Data before, data after. The different question is, how does the data after compare to what the data after would have been in the absence of the petition? That seems to me the logically relevant question to ask if you're trying to figure out whether the post-petition data is of significance to the underlying material injury question. Right. Well, again... I'm sorry. Because it would take account of otherwise exogenous market changes. Okay. And I think I can answer that question by saying that that's sort of the but-for counterfactual world that they proffered up here, which is not in the statute. It's not in the legislative history. It's not in the case law. So that would be... Have we ever rejected that? Because it seems to me the statute does not answer that question. The statute does not unambiguously say compare yesterday to today regardless of exogenous changes. It says whether there's been a change in the data, a change in the volume, price, and impact. I mean, whether... Let's not argue about the statute. Have we ever said that that inquiry is limited to change from yesterday to today as opposed to today versus what today would have been? Well, you have endorsed the commissions, and so has the Court of International Trade in an unbroken line of cases has endorsed the commission's approach here, the approach that it took here. You know, I'm not aware of a case where, you know, you said you can't do a counterfactual, but it's the opposite of the approach that this court and the CIT have endorsed and... Somebody has argued to us the commission failed to comply with this provision by not asking the counterfactual question, and that's fine. You said that's fine. We said it is okay for the commission not to ask the counterfactual question. I'm not aware... No, there's no case... I'm not aware of that because it hasn't been done before. It hasn't been argued, so there isn't actually any precedent on this question. Well, there is in the sense that this court, in new court, commissions looking at volumes, and in the other case we cite in our brief, J&C, nitrogen solutions, other cases that the court has endorsed the approach that the commission has done here. That is our approach. We don't do counterfactuals. Just to say this one more time, an endorsement doesn't count for anything on an issue not presented to the court. If nobody ever asked this court to disapprove the commission's refusal to look at the counterfactual, then it doesn't matter what we said. Fair point, but the counterfactual property here is not based. There's no statutory authority for that in the statute. You can't reclassify subject data as domestic shipment. There's no basis for that. We look at the data in the record as it exists. It's not in the statute or the case law or the legislative history. Okay. Well over your time, I'm going to go ahead and give Mr. Waite his four minutes and we'll give a couple extra minutes to the appellant. Good morning. May it please the court. My name is Fred Waite on behalf of the defendant intervener appellee Jungbunzlauer, Austria. I would like to continue the colloquy that was stopped when Mr. Goldfein sat down on two of the points that your honors have raised and have pursued. First of all, the counterfactual or what might have been had the petition not been filed that you raised, Judge. The statute says shall consider any change in volume, price, and impact. We've heard that repeatedly. Since the filing of the petition, that indicates to me that the commission is to look at volume, price, impact since the petition was filed to see if there are any changes. Logically, the commission in evaluating whether there are any changes is going to look at what happened before the petition was filed. What happened before this act, which was of so much concern to the Congress that it amended the statute to instruct the commission to consider post-petition effects because it was concerned that the mere filing of a petition could so mask the injury that the domestic industry was experiencing that the commission could make a negative determination when in fact it was the petition that was driving increased domestic shipments, reduced imports, increased... But do you understand my... Maybe it's just a confusion on my part, but it seems to me that precisely the congressional concern you just described logically requires an inquiry into a comparison between what happened after the petition and what would have happened after the petition. That's how you figure out whether the petition had an effect. I respectfully disagree. Because just doing before and after completely ignores exogenous changes in the market. Well, I'm not sure the Congress was concerned about exogenous changes in the market. The Congress was concerned about a petition is filed, the Congress is concerned that after the filing of the petition, foreign producers constrict their exports to the United States and raise their prices in order to try to respond to the petition. It's not going to affect the outcome, incidentally, because the periods of investigation of both the Commerce Department and the International Trade Commission terminate when the petition is filed. So it doesn't change that data. What it might change, as the Commission is looking in its final determination, is whether or not the domestic industry had a boost after the petition was filed and looks far better than it would otherwise have looked. Now, the Commission does do counterfactual analyses in sunset and threat cases, but that's because it's looking forward. It's trying to speculate what would happen if an order is revoked. What would happen if we did not make a threat finding, given the factors that we're looking at in terms of the foreign producer's behavior and the domestic industry's performance? Speculation. And the Commission acknowledges that and the Court acknowledges that. It's looking into the future. Here, the Commission has actual data, and the actual data is overwhelming. The Commission all consistently focuses on price and volume, and I keep saying that's what we're supposed to be looking at. What does impact mean, separate from price and volume? It's a third word used in the statute. Couldn't that have to do with the percentages of the market or other factors that are less concrete? Well, I wouldn't say less concrete, Your Honor, but indeed, impact is changes in price and volume are going to impact market share. Right, but are you saying that impact has no independent meaning other than changes in price and volume? Impact is looking largely at the domestic industry, at its operational performance, at its financial performance, and impact means what are the changes in pricing? What are the changes in volume? What are the absolute pricing and volume impacts on the U.S. industry? So what, they look at profit? I beg your pardon? They look at profit? The domestic industry? Yes. Yes, if the post-petition effect is that the foreign producers stop shipping and increase their prices, yes, then the domestic industry looks better than it otherwise would. Its shipments go up. Its sales go up. Its capacity utilization rates improve. Its profitability improves because it's selling at a higher price. And if Your Honor, without taking a breath, I just wanted to address one final point and it has to do with that elusive oil field purchaser who's been the subject of so much concern this morning with its, and you were correct, Your Honor, it's a couple of percentage points. It's not several percentage points. Be that as it may, that producer was only one of 33 producers who submitted questionnaire responses. I would urge, Your Honor, to look at that one questionnaire response from that producer. It does not say what the appellant's claimant says. It does not say that the shift was the result of the petition. Indeed, if Your Honors will look very closely at that purchaser's purchases over the period of investigation, you will see that that purchaser didn't shift at all during this investigation. It did not shift from imports to domestic. Thank you, Your Honors, unless you have any other questions. Thank you. All right, we'll restore your full five minutes. May it please the Court, Nancy Noonan again on behalf of appellants. Just to get back to our elusive oil field purchaser. We do have the other side of the story. We have evidence on the record from the domestic producer from whom that purchase was made, which where the domestic producer  that if that purchase was made and it was made by the domestic producer, it was made due to the petition being filed. We do have two sides to the story there. Let's look at what it actually says. We have made the connection based on the totality of having the domestic producer's information on the record coupled with this purchase, coupled with the presumption that is allowed, that the Commission may apply, that if something changes after a petition is filed, it can be presumed that that change was based on the petition being filed. It is a rebuttable presumption, but we feel that there's nothing on the record. But it's not even a presumption that's automatic. It's a discretionary presumption. That's correct, Your Honor. So, I mean, even if they choose to apply the presumption, then it's rebuttable, but they don't have to apply the presumption. That's correct. We think they have the discretion to apply the presumption. We think in at least one other case, I think it was the Cold Ruled Steel case, they did specifically reference the presumption. One of the commissioners mentioned the presumption as well during questioning at the hearing. But we think that, I mean, just to get back to the data before the petition and the data after the petition, we think that that's enough to show that there was a post-petition effect. And whether you call it counterfactual, or you... There's been a lot of talk, and I don't have a clear grasp of this, but the data that you rely on and the But For World chart is not actually a comparison of pre-petition data and post-petition data, but something different. Can you address that? Well, we did look at the whole 2012 period in that chart that we put together because we had the annual data of all the imports coming in, and it matched exactly with what the commission's staff report said. So, it is true that we provided that data in the context of the entire 2012 year. Because there's an overlap. Is that what... But what we do know, though, is that particular sale did not occur until after the petition was filed. The petition was filed in June 2012. And contrary to the ITC Council's position, we actually are not necessarily saying the commission should completely disregard 2012. We actually think the commission could continue to keep on the record the 6 months of 2012 before the petition was filed and then discount, if they choose to do so, discount the weight of the evidence for the second half of 2012 after the petition's filed. Given the price and volume trends or maybe the lack of change, isn't there at least substantial evidence to support what the commission chose to do here? Well, for both of those provisions in the statute, the commission ultimately made it a market share decision. They said, yeah, this volume is increasing, which normally, frankly, would have resulted in affirmative material injury. But they said, but even though it's increasing, we have relatively the same market share. They said there's significant underselling, but the underselling has not resulted in capturing market share from the domestic industry. So I think in this case, which I do think is unique, I mean, it really ultimately comes down to market share. And for us, we think the evidence shows a huge shift in market share based on the post-petition effects. Can I ask you to talk to me for a minute about the precedent question that I was discussing a little bit with the commission's lawyer? Assume for a minute with me that the statutory language leaves open whether the commission is supposed to consider yesterday versus today or today versus what today might have been. Have we addressed that question? Have we even presented a contention that the commission, by looking only at the yesterday versus today comparison, failed to fulfill its obligation to consider change in the sense of change from what would have occurred in the absence of the petition? I cannot think of a case, Your Honor, where the court directly addressed that question. Okay. And one other precedential question. I know that there are statutes all over the U.S. Code that tell agencies to consider something. Are you aware of any cases, you know, other courts of appeals in APA land that address, that provide a formulation for how we should decide or how courts should decide when a set of remarks constitutes consideration or evidences consideration and when it doesn't? I don't recall that we necessarily looked into that. I'm hoping it's because it wasn't out there. But we were just relying on the plain meaning of the statute of the word consider. What does it mean? Could there be a Chevron overlay to this? Well, I think consider to be plain language. The plain language of the statute is to consider it. And then you look at the evidence that was presented and whether the evidence was considered. And here we think the evidence was not sufficiently considered. And the citation to your brief where all the evidence was laid out is not enough? No, because all they ultimately hung the hat on was some evidence that domestic producers were approached. And we laid out a lot more than just some evidence of that. So I don't think that was sufficient. Okay. Thank you. Thank you.